UNITED STATES DISTRICT COURT

DISTRICT OF MAINE

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | 2:24-cr-00090-LEW |
| | ) | |
| JUSTIN NEVES and SHEILA T-SREY, | ) | |
| | ) | |
| Defendants | ) | |

## ORDER ON DEFENDANTS' MOTIONS TO SUPPRESS

Defendants Justin Neves and Sheila T-Srey face charges of Conspiracy to Distribute a Controlled Substance (ECF No. 1). Some of the Government's evidence comes from a warrantless probation search of T-Srey's home, during which law enforcement seized multiple cellphones and a subsequent search of those phones pursuant to a warrant. Before the Court are Neves's and T-Srey's Motions to Suppress (ECF Nos. 43-44). For reasons that follow, I find the probation search was in violation of T-Srey's Fourth Amendment rights but not Neves's and that, because of the violation of her rights, the follow-on search of the phones, though supported by a warrant, must be suppressed, as to T-Srey, as fruit of the initial violation.[1]

---

[1] Neves and T-Srey also moved for a *Franks* hearing to attack the veracity of the search warrant affidavit. I denied the request after determining probable cause existed to search the phones absent any misrepresentations or omissions in the warrant affidavit. *See* Order on Def. Neves Mot. for a *Franks* Hearing (ECF No. 70). At the hearing on Defendants' Motions to Suppress, Neves made an Oral Motion for Reconsideration (ECF No. 72) of that Order. In supplemental briefing, Neves attacks the credibility of police informants who provided law enforcement with a basis to suspect Neves had violated his probation conditions. While a *Franks* hearing can be an appropriate setting to challenge informant veracity, neither the evidence from the suppression hearing nor the parties' supplemental briefing changes my previous conclusion. Even if the warrant affidavit were revised to include detailed credibility assessments of police sources, probable cause to search the phones would still exist. Neves's Motion to Reconsider (ECF No. 72) will be denied.

**BACKGROUND**

The background is drawn from the docket of *United States v. Neves*, No. 2:19-cr-00133, Defendants' Motions (ECF Nos. 43-44), the Government's Response in Opposition (ECF No. 56), Defendant's Replies (ECF Nos. 67-68), the suppression hearing held on March 6, 2025, and the parties' supplemental post hearing briefs (ECF Nos. 79-81).

What is ultimately a two-defendant conspiracy case involves a long history of separate crimes, investigations, and individuals. Roughly five years ago, Defendant Neves was convicted in this Court of conspiracy to violate federal firearms law and sentenced to a 15-month term of imprisonment. *United States v. Neves*, No. 2:19-cr-00133 (Dec. 4, 2019 Judgment, ECF No. 22). Following his imprisonment, he began a three-year probationary term which he served in both Massachusetts and Maine. In Maine, U.S. Probation Officer Kate Phillips supervised Neves. Two years into his release, Neves was arrested following a traffic stop in which officers found cocaine on his person. The Court revoked his supervised release and sentenced him to a 14-month term of imprisonment followed by a 12-month term of supervised release. *See id.* (Jan. 24, 2023 Revocation Judgment, ECF No. 52). At both the original sentencing and the revocation sentencing, the court imposed special conditions of supervised release. Neves did not object to the condition at either proceeding. The special conditions include the following search condition:

> A United States probation officer may conduct a search of the defendant and of anything the defendant owns, uses, or possesses if the officer reasonably suspects that the defendant has violated a condition of supervised release and reasonably suspects that evidence of the violation will be found in the areas to be searched. Searches must be conducted at a reasonable time and in a

reasonable manner. Failure to submit to a search may be grounds for revocation of release.

*Id.*, Special Cond. No. 3 ("search condition"). Certain mandatory conditions of release prohibit Neves from criminal conduct and unlawful possession of a controlled substance. *Id.* (Mandatory Cond. 1-3). Other Special Conditions also prohibit Neves from using or possessing a controlled substance, owning a firearm, or knowingly being in the company of someone who possesses a firearm. *Id.* (Special Cond. 2, 4). Present during Neves' revocation proceedings was Defendant T-Srey, the mother of three of Neves's children. Also present was Officer Phillips.

On January 19, 2024, Neves began his second term of supervised release. To secure housing for Neves, Officer Phillips asked T-Srey if Neves could live with her. T-Srey said no. Additionally, Officer Phillips was informed by local police that T-Srey's neighborhood had an uptick in gang activity, making it unsuitable housing for Neves. Officer Phillips instead secured Neves a room in a sober living home. Officer Phillips testified that Neves self-reported that he immediately went to T-Srey's house after leaving jail. Neves did eventually move into sober living shortly after his release. However, both Neves and the manager of the sober house reported to Officer Phillips that Neves spent the bulk of his time at T-Srey's residence. Neves's children lived with T-Srey, and Neves told Probation that spending time with his children and getting out of sober living was a priority for him.

On February 2, 2024, a gang-related, broad-daylight, drive-by-shooting occurred in Saco, Maine. Occupants in two cars shot at each other before one raced into an intersection and collided with a school bus. Neither T-Srey nor Neves was involved in the actual shooting. Instead, two accused shooters, Joshua Estrada (a/k/a "Mac") and Yancarlos

3

Abrante (a/k/a "Glizzy"), now face criminal charges in a separate proceeding. But T-Srey's and Neves's relationships with Estrada and Abrante prompted law enforcement scrutiny.

FBI Task Force Officer Jonathan Duquette testified that Neves was the first named suspect for the Saco shooting. However, T-Srey voluntarily told Officer Duquette she had picked up the Saco shooters and driven them away at their request. T-Srey did not identify Neves as one of the shooters and the FBI soon surmised that he was not involved. Although Neves was no longer a suspect, Officer Duquette learned that Neves was on supervised release, was associated with the Gangster Disciple Nation,[2] went by the name "Savage," and had some relationship with Estrada and Abrante.

Prior to Neves's second term of supervised release, local police also informed Officer Phillips both that Neves had some gang affiliation and that many Gangster Disciples members, including Abrante, were in the area around T-Srey's house. Officers investigating the Saco shooting also told Officer Phillips about T-Srey's involvement as a getaway driver. Officer Phillips spoke with Neves about the Saco shooting and Neves denied any involvement while corroborating T-Srey's own story. Despite his exculpatory statements, Officer Phillips remained concerned about Neves's (and T-Srey's) connections to the persons involved. Officer Phillips requested, and was granted, a modification of Neves's supervised release conditions. Per the new conditions, by February 15, 2024, Neves was subject to a 90-day, 9:00 p.m. to 6:00 a.m. curfew enforced by a location-

---

[2] A street and prison gang.

4

monitoring ankle bracelet.  GPS data produced by the bracelet revealed Neves spent most of his non-curfew time at T-Srey's house.

The FBI also received information on how Neves spent his time through an anonymous source, SOI-1.  SOI-1 reported that he or she used to buy drugs from Neves, Abrante, and Estrada, though SOI-1 knew them as "Savage," "Mac," and "Glizzy," respectively.  SOI-1 identified all three from photo arrays.  SOI-1 stated that he or she owed drug money to Neves and had recently seen Neves driving a black Chrysler 200.  Upon seeing SOI-1, Neves drove up, opened the door of the Chrysler, and flashed a Glock handgun.  SOI-1, fearful of retribution for the debt, retreated inside a building.[3]

If SOI-1's story could be corroborated, the FBI wished to interview Neves.  So, the FBI reached out to Officer Phillips.  An agent informed Phillips that Neves was not a suspect in the Saco shooting, but nonetheless was suspected of carrying a firearm, and requested that Phillips check Neves's GPS data on the date and time SOI-1 provided for the incident.  The GPS data indeed placed Neves where SOI-1 said he was.  The FBI then asked Officer Phillips "what [it] need[ed] to do to get real time pings for him from you guys?"  Gov't Ex. 6 at 2.  Officer Phillips informed the FBI that it could not be granted

---

[3] SOI-1 did misidentify a different individual as Estrada and has a history of addiction and crimes of dishonesty.  Security camera footage shows someone walking past the front of SOI-1's reported hiding place.  Neves uses this piece of evidence, along with Officer Duquette's testimony that the individual on camera was not Neves, to rekindle his arguments for a *Franks* hearing.  Neves argues that if he was not the person on camera, the veracity of SOI-1's story, and by extension Officer Duquette's later affidavit to search Neves's phones, is called into question.  Neves also contends he and SOI-1 know each other well and are on friendly terms.  This evidence does not change my earlier determination denying Neves's request for a *Franks* hearing.  SOI-1 stated that the person captured in security footage was not Neves but was a passenger in the Chrysler.  Gov't Ex. 3 at 5.  In any event, law enforcement did not take SOI-1's story for granted but corroborated it with GPS data from Neves's ankle monitor.

direct access to Probation's data but that she could do her best to provide real time data as needed.

About a week after SOI-1's report, Neves was pulled over by Westbrook police while driving T-Srey's Honda. The officer conducting the traffic stop seized $580 from Neves's pockets and requested that Officer Phillips delegate bail search authority. Officer Phillips found the amount of money suspicious because Neves was unemployed. Even so, Officer Phillips told Westbrook police she could not delegate search authority.[4] Later that day, Neves called Officer Phillips to explain the money was a combination of T-Srey's tax return and cash a friend gave him.

One day after Neves's traffic stop, another source of information, SOI-2, was arrested on drug charges. SOI-2 owned a black Chrysler 200. SOI-2 told the interviewing detective he or she had loaned the car to a "Brandon" one-to-two weeks ago in exchange for cocaine. SOI-2's description of Brandon was very similar to Neves, down to describing a "big ankle bracelet." SOI-2 also said Brandon lived in a sober home but spent his time in the Pinebrook development, where T-Srey lives. SOI-2 recounted that Brandon appeared with a large amount of cash and his girlfriend. SOI-2 provided two phone numbers for Brandon, one of which matched Neves's number in Probation's records.

Within the week, Officer Phillips became aware that Neves was attached to SOI-2's police report. She ran the Chrysler's license plate number through police databases and found it was registered to SOI-2 at an address in Old Orchard Beach. Again, Officer

---

[4] Later, Old Orchard Beach police conducted a traffic stop of Neves and requested search authority. Officer Phillips informed the officer involved that she could not delegate search authority.

Phillips checked Neves's GPS data.  She found Neves had been at the address about 18 days before SOI-2's report.  Between SOI-1 and SOI-2's reports, Officer Phillips now suspected Neves had possessed both a firearm and drugs.

Meanwhile, the FBI had recovered multiple phones from the abandoned car that had crashed into the Saco school bus.  Officer Duquette obtained a warrant to search those phones.  Officer Duquette determined that one phone belonged to Abrante, a/k/a "Glizzy."  That phone had a Snapchat exchange between users "glizzy_ftz" and "reallyright7414," with respective display names "600% Glizzy" and "J Sav."  A portion of the conversation reads:

| <u>**"600% Glizzy"**</u> | <u>**"J Sav"**</u> |
|---|---|
| You fried bro you and sko stop fucking ducking me<br>I banged my gun recently yu better believe it your washed up never been on a real drill yu never tagged an opp<br>LMAOOO | |
| | U n***** got no tags<br>My mom calling |
| Yu never tagged an opp | |
| | I'm up one don't make it 2 |
| Idc shots getting thrown tonight regardless | |
| | That's cool give a n**** a heads up let's make it interesting |
| Yu not coming outside gotta make yu come somehow<br>Idgaf what yu sayin<br>Im playing cribs<br>So let's go there | |

Yu sound pussy

> I'm not ducking nun u come to my crib I'm
> coming outside
> Free
> Yk Maine laws

That's not your ahit
That's hers
So not free

> Ik I'll do time for a gun
> Happily

Can't throw first either

> It's a free tag I promise
> I'll open the door

Officer Duquette testified he believed the user "J Sav" to be Neves. He based his conclusion on "Sav" being short for Savage and 7414 being an alphanumeric cypher decoded as "GDN" (the seventh, fourth, and fourteenth letters of the alphabet) or "Gangster Disciple Nation." Officer Duquette believed these messages meant Neves had a gun. He read "opp" to mean rival gang member and "tag" to mean murder, especially when surrounded by many references to "shots" and "guns." He viewed the messages as threats between the two: Glizzy accusing J Sav of never committing murder, and J Sav responding he had in fact murdered someone and would murder Glizzy. He interpreted J Sav's statements about doing time for a gun under Maine law to mean J Sav was in Maine and illegally in possession of a gun.

Officer Duquette testified that the FBI intended to investigate Neves further through surveillance. At the same time, Officer Duquette disclosed the Snapchat conversation to Officer Phillips and discussed "wanting to do a traffic stop on [Neves] and catch him with

a firearm." Gov't Ex. 1 at 51. To that end, the FBI requested Officer Phillips assist by providing GPS data. *Id.* But before any surveillance began or a traffic stopped occurred, the FBI was folded into Officer Phillips' own probation search.

Officer Phillips testified that between the Snapchat messages, SOI-1's and SOI-2's reports, and Neves's traffic stop, she thought she had a reasonable suspicion to perform a probation search of Neves, his room at the sober living facility, T-Srey's home, and T-Srey's car. Officer Phillips further testified that she asked the FBI to support the search for safety purposes and because the FBI was familiar with Neves and T-Srey from its own investigation. Based on her testimony and the exhibits submitted by the Government, I find that Probation Officer Phillips prepared a search plan that the FBI worked under. However, Officer Duquette testified he too wanted to search T-Srey's apartment both to serve her a subpoena related to the FBI's investigation and to find evidence of a firearm and/or drugs. Probation's search plan included tracking Neves via his ankle monitor and having the FBI conduct a traffic stop, as initially proposed by the FBI. Gov't Ex. 1 at 55; Gov't Ex. 2 at 2. But no such traffic stop occurred.

Instead, Officer Phillips, members of the FBI Task Force, and some Old Orchard Beach police officers went directly to T-Srey's home, an apartment in Old Orchard's Pinebrook development, where Neves answered the door following their arrival. Neves's one-year-old son and T-Srey were also present. Officers asked them to wait outside, and the FBI and local police cleared and then searched the home. T-Srey and her son sat in a police car, unhandcuffed and not Mirandized. Neves stood outside in the rain. Officer Phillips asked T-Srey if there were any weapons inside. T-Srey admitted there was one

gun in a safe in the basement, said it belonged to her, and denied that Neves had access to the safe.  T-Srey provided the safe passcode.  Inside the safe, officers found a Mossberg 9mm and ammunition along with a Glock magazine.  The 9mm belonged to T-Srey.  T-Srey said she had found the Glock magazine in the laundry room and moved it to the safe. Neves denied that the gun, ammo, or magazine were his or that he had access to the safe.

From the rest of the house search police found three cellphones: the first in the living room near where officer observed Neves upon their approach to the front door, the second in a kitchen cabinet, and the third behind a child's bed.  Police also found $1,560 in cash, all of which was later returned to T-Srey.  Neves refused to provide the passcodes for the cellphones.  Probation then arrested Neves for violating his release conditions.  Meanwhile, Probation alone searched Neves's sober living bedroom.  There they found a Cash App card personalized "$BosJSav7414."

After the probation searches, Officer Duquette sought a warrant to search the seized cellphones.  Officer Duquette testified that open-source research and T-Mobile records linked Neves's Cash App account to Neves's known cellphone number.  Officer Duquette also received Snapchat records linking the user "J Sav" to Neves's cellphone number.  His affidavit in support of the warrant details 600% Glizzy's and J Sav's Snapchat messages, Neves's criminal history, the probation search, and his own belief that multiple cellphones signaled illegal activity.  That warrant issued, and here we are.

## DISCUSSION

The Fourth Amendment provides:  "The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not

be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." U.S. Const. amend. IV. Although the Fourth Amendment enumerates persons, houses, papers, and effects, "the home is first among equals," *Florida v. Jardines*, 569 U.S. 1, 6 (2013), and warrantless entry into and search of a home is the "chief evil" against which the Fourth Amendment was directed, *Payton v. New York*, 445 U.S. 573, 585 (1980).

When it comes to the home, the reasonableness of a search is typically demonstrated when law enforcement conducts the search pursuant to a particularized warrant supported by probable cause. *United States v. Graham*, 553 F.3d 6, 15 (1st Cir. 2009). In fact, warrantless searches and seizures within the home are "presumptively unreasonable." *Payton*, 445 U.S. at 586. Nonetheless, the Fourth Amendment's reasonableness requirement is "highly situational." *Wood v. Clemons*, 89 F.3d 922, 928 (1st Cir. 1996). "The standard of 'reasonableness' that governs searches in a given context depends, in general, upon a balancing of 'the need to search against the invasion which the search entails.'" *Id.* (quoting *Camara v. Municipal Court of San Francisco*, 387 U.S. 523, 536-37 (1967)). "[T]he reasonableness of a search is determined 'by assessing, on the one hand, the degree to which it intrudes upon an individual's privacy and, on the other, the degree to which it is needed for the promotion of legitimate governmental interests.'" *United States v. Knights*, 534 U.S. 112, 119-20 (2001) (quoting *Wyoming v. Houghton*, 526 U.S. 295, 300 (1999)). Where the balancing tips in favor of the government, an exception to

the warrant requirement may exist. *See United States v. Graham*, 553 F.3d 6, 15 (1st Cir. 2009).

With these general principles in mind, I turn to the reasonableness of the probation search as it effects Neves's and T-Srey's respective privacy interests.

## A.    Neves's Motion to Suppress

One context where a warrantless search may be reasonable is the now common exception associated with persons on probation or subject to conditions of release. Probation is a criminal sanction that, like other sanctions, comes with restrictions on freedom. *Griffin v. Wisconsin*, 483 U.S. 868, 873-74 (1987). Probationers do not have "the absolute liberty to which every citizen is entitled, but only . . . conditional liberty properly dependent on observance of special [probation] restrictions." *Morrissey v. Brewer*, 408 U.S. 471, 480 (1972).

Here, Defendant Neves was subject to a condition of supervised release that required him to submit to searches of his person and the things he owns, uses, or possesses when his supervising officer reasonably suspects that he has violated a condition of supervised release and reasonably suspects that evidence of the violation will be found in the areas to be searched. This is a substantial dilution of Neves's privacy rights under the Fourth Amendment, to which he is lawfully subjected as a condition placed on his release from what would otherwise be a longer term of incarceration. *Knights*, 534 U.S. at 119-21

(holding that the warrantless search of a probationer's home pursuant to a condition of probation requires only a "reasonable suspicion" under the Fourth Amendment).

Special Condition 3 of Neve's supervised release authorized Probation Officer Phillips to search anything Neves "owns, uses, or possesses" upon the requisite cause. Provided that the cause was there, the condition dispensed with the warrant requirement for purposes of a search particularized to the animating cause. *Cf. Graham*, 533 F.3d 6, 15-16 (1st Cir. 2009) (discussing probation search secondary to execution of arrest warrant); *see also id.* at 18 ("[W]e cannot say that where, as here, the police possess reasonable suspicion that a probationer is violating the terms of probation, the Fourth Amendment demands that the police secure a search warrant before executing a probation search.").

As for Neves's individual privacy rights, his supervisory status "significantly influences the required balancing." *Id.* at 15. Simply being on supervised release reduces privacy expectations. *Id.* The already diminished privacy expectations are also reinforced where, as here, the order "clearly expressed the search condition" and Neves was "unambiguously informed" of it. *Id.* at 16 (quoting *Knights*, 534 U.S. at 113). Through prior sentencing proceedings, the Court advised Neves that he would be subject to search based on reasonable suspicion of a violation of his conditions of release.

Balanced against this diminished expectation of privacy is the government's heightened interest in evaluating and monitoring the conduct of persons on supervised release. *Id.* The United States Office of Probation and Pretrial Services has a legitimate, important interest in "rehabilitation and protecting society from future criminal violations."

13

*Knights*, 534 U.S. at 119.  And this interest comes with a sense of urgency.  "[Probationers] have even more of an incentive to conceal their criminal activities and quickly dispose of incriminating evidence."  *Id.* at 120.  Here, at the time of the search, Officer Phillips had corroborated information that supported (minimally) a reasonable suspicion that Neves had a gun and access to contraband drugs and that his phone(s) would bear witness to the same. With this information, Probation had an interest to locate these items to sanction recidivism and protect the public.

Thus far, based on a balancing of Neves's and the Government's respective interests, I find that the probation search of Neves was reasonable because it was supported by reasonable suspicion of recent violations of conditions of release and reasonable suspicion that evidence of those violations would be found not only in the residence where Neves observed his evening curfew, but also in the residence where Neves passed the majority of his days.

The variables that Neves believes could tip the balance in his favor, however, are the contention that he did not really "reside" in T-Srey's apartment; the fact that cellphones were seized rather than a gun or drugs; and the possibly strategic use of the search condition to disregard the warrant requirement, which Neves's analogizes to a "stalking horse."  I address these remaining contentions in turn.

### 1. *The dispute over residency*

While there is ample caselaw about residence and what that means in other contexts, in this context it is nothing more than a wild goose chase.  After all, the search condition was not limited to probation searches conducted at Neves's residence.  Additionally,

14

because Neves's privacy interest was sufficiently diminished to dispense with the warrant requirement as far as his own residence was concerned, if, as he says, T-Srey's residence was not his own, that fact would not avail him as far as his Fourth Amendment rights are concerned. *See Steagald*, 451 U.S. at 219 ("[R]ights such as those conferred by the Fourth Amendment are personal in nature, and cannot bestow vicarious protection on those who do not have a reasonable expectation of privacy in the place to be searched."). Neves's privacy expectations would be no greater at T-Srey's home if he were merely a guest than they would be if he resided there full time.[5] Nor can he hide from the search condition by taking shelter behind T-Srey's Fourth Amendment interest. *Id.*; *United States v. Lucas*, 499 F.3d 769, 779 (8th Cir. 2007); *United States v. Taylor*, 482 F.3d 315, 318-19 (5th Cir. 2007).

The harsh reality is that probationers have significantly eroded liberty interests. Whether he was observing curfew in sober living or spending the day at T-Srey's apartment, Neves's privacy expectations remained low and were outweighed by the Government's probationary interests. Thus, for purposes of Neves's Motion to Suppress, the Fourth Amendment, as augmented by Special Condition 3, required only that the Government have a reasonable suspicion supporting the probation search at the location in question, assuming they could access the location without forcing their way across a threshold into someone else's exclusive domain. Reasonable suspicion requires "'specific

---

[5] As a visitor, Neves would still have some expectation of privacy in T-Srey's home. *See Minnesota v. Olson*, 495 U.S. 91, 98 (1990) ("[S]ociety recognizes that a houseguest has a legitimate expectation of privacy in his host's home). As a probationer, that expectation of privacy would still be greatly diminished. *Graham*, 533 F.3d at 15.

and articulable facts,' rather than a mere inchoate and unparticularized suspicion or hunch." *United States v. Giannetta*, 909 F.2d 571, 576 (1st Cir. 1990). Reasonable suspicion is "less demanding" than probable cause. *Illinois v. Wardlow*, 528 U.S. 119, 123 (2000).

Officer Phillips' determination to conduct a probation search at T-Srey's residence clears the relatively low hurdle of reasonable suspicion. Two sources of information provided evidence that Neves's was in possession of both a firearm and drugs while off curfew. Officer Phillips used GPS data to corroborate that information. Similarly, from Neves's traffic stop Officer Phillips was aware that Neves had an unexpected amount of money on him with the only evidence to the contrary being Neves's own excuses. On top of that, the FBI provided Officer Phillips with even more corroborating information in the form of the Snapchat conversation between Abrante and Neves. Altogether, Officer Phillips had a sufficient set of articulable facts to give rise to a reasonable suspicion that Neves violated his conditions by possessing a gun and drugs.

As to the nexus requirement, Officer Phillips had reliable information—from Neves himself, from the manager of Neves's sober house, and from GPS data—that Neves spent most of his time at T-Srey's. And T-Srey's apartment would be a much more likely place to hide contraband than a sober house, given the decreased privacy expectation Neves would have at the sober house due to Special Condition No. 3. Officer Phillips's determination that T-Srey's house—Neves's daytime home base—could hold evidence of

Neves's daytime violations of the conditions of his release rested on a set of specific and corroborated facts supporting a reasonable suspicion.

### 2. *Cellphone seizure*

Neves challenges the Government to explain why Officer Phillips would reasonably have suspected that cell phones located in T-Srey's home and not on Neves's person would contain evidence of Neves's violation of a condition of release. Relatedly, Neves argues that the Government had no right to seize any phones because Special Condition 3 did not provide that authority.

Of course, the Government cannot necessarily search everything Neves touches by virtue of the search condition imposed on his supervised release. The scope of its search must be limited to items and areas used, possessed, or owned by Neves that would reasonably be suspected to hold evidence of a suspected violation. *Giannetta*, 909 F.2d at 577. Neves is not wrong to point out that any given person or house could hold several cell phones, including old and unused cellphones. But Officer Duquette testified that T-Srey held her own phone throughout the search. The locations of the phones—in the living room where Neves had been when the officers arrived, in a kitchen cabinet, and behind a child's bed—are not indicative of an extra phone used for work or an old phone not yet thrown out. Nor do the phones' locations demonstrate they were in an area of the house to which Neves would not have ready access. Neves spent significant time in the house, often on his own, and spending time with his children. Given the record, including evidence associated with Neves's suspected Snapchat activity, I find that the Government had reason

to search for cellphones that it could reasonably suspect were utilized by Neves rather than T-Srey.

As for the decision to seize the phones, Neves's condition of supervised release is silent concerning a standard for seizures.  District Courts grappling with probation seizures have applied the lower, reasonable suspicion standard.  *See*, *e.g.*, *United States v. Giannetta*, 711 F. Supp. 1144, 1151 (D. Me. 1989) ("For the same reasons given in *Griffin* for relaxing the probable cause requirement for searches of probationers' homes, a lesser standard should be applied to seizures.").  But this application has not been endorsed by the First Circuit.  *Giannetta*, 909 F.2d at 578-79 ("Although we take note of this difference between searches and seizures, this case does not require us to decide how, if at all, the difference affects the standard governing seizures made pursuant to probation searches.").

I apply the articulable suspicion standard found in Special Condition 3 and conclude that there was adequate suspicion to justify taking all the phones at issue.  Officer Phillips was aware from SOI-2 that Neves potentially had two phone numbers.  Even more to the point, from the FBI's recovered Snapchat messages, Neves possibly discussed access to or possession of a gun using his phones.  Neves also refused to give Officer Phillips access to his personal cell phone found in the living room, without disavowing ownership, which runs against his conditions of release.  Because Probation came in with a reasonable suspicion that Neves was using multiple phones to discuss and facilitate illegal activity, quickly found multiple phones, and attempted, but was denied, a probation search of one phone, a reasonable person could suspect that spare, unaccounted for phones hid evidence

18

of Neves's suspected criminal conduct.  Consequently, Probation's seizure of the phones was lawful as to Neves.

### 3.    Probation as a stalking horse

Neves lastly contends that Probation served as a "stalking horse," only searching T-Srey's house to help police avoid the warrant requirement.  Interagency police action carries with it "a possibility of subterfuge designed to evade the Fourth Amendment." *United States v. Scott*, 566 F.3d 242, 246 (1st Cir. 2009).  But this possibility does not preclude cooperation, nor does the "mere presence of police" transform a probation search into a police search.  *Giannetta*, 909 F.2d at 581.  And law enforcement agencies are free to share information that may trigger a probation search.  *See Scott*, 566 F.3d at 246 (collecting authority).  For cooperative searches, the First Circuit's focus is on the decision-maker.  *See United States v. Cardona*, 903 F.2d 60, 65 (1st Cir. 1990) ("The law will not allow a parole officer to serve as a cat's paw for the police."); *Scott*, 566 F.3d at 248 ("[W]e have previously identified [the decision-making phase] as the Fourth Amendment's central concern in the context of parole"); *Giannetta*, 909 F.2d at 581 ("[T]he record reveals that it was [the probation officer's] decision to search and that he was in charge of the searches and decided what to seize.  We find no sign of any subterfuge.").

Defendants make much of the number of task force and municipal officers involved in the search and the fact that Probation's search plan included the FBI's own plan to begin the encounter with a traffic stop of Neves.  But unless those FBI agents were instigating and directing the probation search, it is a permissible team up.  *Giannetta*, 909 F.2d at 581.  Officer Duquette testified that the FBI would have liked to search T-Srey's house but it

"wasn't going to get there until [it] could potentially do more stuff like surveillance on Mr. Neves."  Suppression Hearing Tr. (ECF No. 78) at 47:13-14.  And although it planned to surveil Neves, the FBI was then asked to help with the probation search.  Officer Phillips testified that the FBI's assistance was requested for safety reasons and the FBI was a logical choice as it was familiar with Neves.  Both Officers Duquette and Phillips testified it was Probation's decision to search T-Srey's house, which is supported by Probation authoring the search plan.  Likewise, the two testified it was Probation's decision to seize the phones which Probation later turned over to the FBI.  I find this testimony to be credible.

As to the planned but unperformed traffic stop, Officer Phillips testified that she did not know where the traffic stop idea came from.  In any event, the traffic stop did not happen, and the First Circuit has "long endorsed 'mutually beneficial cooperation' between law enforcement and probation officers," *Scott*, 566 F.3d at 246 (quoting *Giannetta*, 909 F.2d at 581).  Both agencies were looking for a gun.  Probation to prevent recidivism, and the FBI to investigate criminal activity.  Officer Phillips's agreement to fold a traffic stop into a probation search plan does not smack of impermissibly circumventing the Fourth Amendment.  Testimony and evidence reveal Officer Phillips oversaw and implemented the search, even if part of that search plan was initially the FBI's idea.

In summary, with respect to Neves's Fourth Amendment Rights, the search was reasonable, the seizure of the phones was supported by a reasonable suspicion if not probable cause, and Probation was not acting as a "stalking horse."  For all of these reasons, Neves's Motion to Suppress will be denied.

**B.**    **Defendant T-Srey's Motion to Suppress**

Unlike Defendant Neves, Defendant T-Srey was not on probation or supervised release and was not subject to any special condition requiring her to submit to searches of her person or possessions.  Of the two Defendants, she has the much stronger claim that the warrantless search of her home violated her individual Fourth Amendment rights.  *See Steagald v. United States*, 451 U.S. 204, 219-20 (1981).  She appropriately asserts these rights against the "chief evil" of a warrantless invasion of her home, and that invasion cannot be overlooked easily.  *Payton*, 445 U.S. at 585.

Here, a condition of supervised release required Neves to make himself and his possessions available for inspection, but there was no detached and neutral judge or magistrate who authorized any law enforcement invasion of T-Srey's rights on the day the search condition was implemented.  It is difficult to understand why T-Srey should be denied the protection of a search warrant or why the potential for abuse would be diminished in this scenario simply because the search was led by a probation officer and the probationer was a guest in the home.[6]  In my own view of the Fourth Amendment, a probation search condition is insufficient search authority as to third-party non-probationers whenever officers participating in the search anticipate an extensive search of

---

[6] The Court has great faith in the officers of the United States Office of Probation and Pretrial Services. The potential for abuse here is in large part born out of concern that law enforcement officers should not see in a probation search condition a special pass to enter and search the homes of third parties.  In this case alone, non-probation officers requested, and were refused, some form of delegated probation search authority from Officer Phillips twice.  The attractiveness of such a tool in ferreting out crime and the pressure that might arise for probation officers if it were condoned would in time only serve to diminish the trust and authority that probation officers must have to carry out their duties, which in the main do not consist in ferreting out crime but rather in rehabilitating the persons in their charge.

the third party's premises without limitation to the probationer's person and items within his immediate command.  The same is true when those officers intend to seize for later search cell phones that they do not know are owned by the probationer.[7]  Any lesser standard, such as reasonable suspicion, would be effective exclusively against the probationer.  *See United States v. Davis*, 932 F.2d 752, 758 (9th Cir. 1991) ("We therefore conclude that police must have reasonable suspicion, that an item to be searched is owned, controlled, or possessed by probationer, in order for the item to fall within the permissible bounds of a probation search.").  That is, unless the officers are willing to forego the opportunity of using the fruits of such searches and seizures against the non-probationer resident of the home, they must, before commencing the search, secure a warrant that authorizes, with particularity, the premises to be searched and the items to be seized.  That is my preliminary conclusion of law, though I entertain alternative approaches advanced by the Government, below.

Some courts have held that a co-resident of a probationer has a diminished expectation of privacy provided that the co-resident knows that the probationer and his or her premises are subject to a search condition.  *See Lipford v. City of Chicago*, No. 15-cv-6988, 2018 WL 3474534, at *5 (N.D. Ill., July 19, 2018) (collecting authority and concluding that the right of co-resident to be free from warrantless search was not clearly

---

[7] The dispute over the seizure of cellphones best highlights why T-Srey's Fourth Amendment rights should not be negated by Neves's probationer status and presence in her home.  Officer Phillips and the agents and officers present that day did not presume to be able to search T-Srey's home in Neves's absence.  Nor did they presume that they could seize T-Srey's personal cell phone.  But where to draw the line between a discovered cell phone in terms of T-Srey's ownership and use versus Neves's was not clear.  Even though they could suspect Neves's use of spare cell phones, the relative uncertainty amplifies the appropriateness of securing a search warrant before searching for and seizing all cellphones present in the home insofar as T-Srey's privacy interest is concerned.

established for purposes of a qualified immunity analysis); *see also Thornton v. Lund*, 538 F. Supp. 2d. 1053, 1058 (D. Wis. 2008) (rejecting the principle as unsubstantiated by binding precedent but finding the law was not clearly established).  However, in these civil cases, the issue may be whether law enforcement's entry into a home produces an immediate constitutional deprivation for non-probationer residents, rather than an inquiry into whether the Fourth Amendment protects the co-residents against searches of their own premises or private living quarters in the absence of a search warrant or consent.[8] Generally, reasonable belief that the probationer makes his home in the premises is sufficient to make an entry and search for the probationer reasonable.  *See, e.g.*, *Moore v. Vega*, 371 F.3d 110, 114-118 (2d Cir. 2004).[9]

Still, there is a line of cases that treat non-probationer co-residents as having lowered (nigh negligible) privacy expectations when it comes to searches of shared premises.  *See United States v. Harden*, 104 F.4th 830, 836-37 (11th Cir. 2024); *id.* at 838 n.3 (collecting state authority).  On this view, non-probationers "assume the risk" of

---

[8] Some probation search cases that implicate non-probationer cohabitants' rights have adopted a theory that the probationer, by virtue of their release conditions, effectively consented to searches of all areas of the home under the probationer's exclusive or joint control.  *See, e.g.*, *United States v. Crew*, 345 F. Supp. 2d 1264, 1268 (D. Utah 2004) ("Because [the Government] had such reasonable suspicion of a violation of the terms of his conditions of parole, Defendant had given consent to search his residence.").  But the Supreme Court has never held that acceptance of a probation search condition is the equivalent of consent.  The Court instead focused on probationer's diminished privacy expectations.  *See Samson v. California*, 547 U.S. 813, 852 n.3 (2006) ("[W]e need not reach the issue whether acceptance of the search condition constituted consent . . . ." (internal quotations omitted)); *Knights*, 534 U.S. at 118 ("We need not decide whether Knights' acceptance of the search condition constituted consent . . . .").  On top of that, the Government has not made any argument that it had consent from either Neves or T-Srey.  *See United States v. Vanvliet*, 542 F.3d 259, 264 (1st Cir. 2008) ("[T]he government bears the burden to prove by a preponderance of the evidence that defendant or an authorized third party gave the consent voluntarily").  Accordingly, I do not address whether Defendants may have consented to the search.

[9] Moore involved a search for a parolee.  Parolees and probationers are generally in the same predicament insofar as their Fourth Amendment rights are concerned.

diminished Fourth Amendment protections by voluntarily choosing to live with a known probationer, typically, if not universally, in jurisdictions with legislation subjecting all probationers or parolees to warrantless searches. *Id.* at 838 n.3 (citing *State v. Adams*, 788 N.W.2d 619, 624-25 (N.D. 2010)).

In the Government's view, *Harden* is on point. Harden lived fulltime with her probationer boyfriend. *Id.* at 831. Harden knew about the probation and, whenever Probation had visited her home, she had answered and brought her boyfriend "to the door so [Probation] could talk to him." *Id.* at 838 (internal quotations omitted). One day, Harden allowed Probation into the home although her boyfriend was absent, whereupon the probation officer smelled marijuana and performed a probation search that ultimately implicated Harden. *Id.* at 832-33. The officer walked from room to room, supposedly following his nose to a closet and a backpack located there. *Id.* at 832. Balancing interests, the Eleventh Circuit rejected Harden's Fourth Amendment claim that the search was unreasonable as to her own right to be secure in her home against warrantless searches. *Id.* at 838.

In reaching its decision, the *Harden* court piggybacked on the Ninth Circuit's reasoning in *Smith v. City of Santa Clara*. 876 F.3d 987, 994 (9th Cir. 2017). In *Smith*, a probationer was at large after she and an accomplice stole a car and stabbed a man. *Id.* at 989. Police searched the probationer's mother's house, which was on record as the probationer's home. *Id.* The mother sued the city for violating her constitutional rights. *Id.* The Ninth Circuit recognized that a non-probationer has a greater privacy interest but found "the governmental interest at stake sufficiently great" to outweigh the mother's

24

Fourth Amendment interests. *Id.* at 994. The court "stress[ed] that [its] conclusion is limited to the facts of this case, where the police had probable cause to believe that the probationer, who was on probation in connection with serious offenses, had just participated in a violent felony and was still at large." *Id.*

I find the rationale of *Harden* and *Smith* unconvincing when applied in this case. As for *Smith*, the case entailed a less invasive search. Officers entered the home to search for the probationer at her address of record, not to search the entire premises for evidence of any and all criminal activity. That law enforcement might reasonably enter a shared home to locate a probationer does not mean that law enforcement should be permitted to prosecute any other resident based on evidence discovered in the process of a generalized search, absent a search warrant. *Steagald*, 451 U.S. at 213-14 & n.7. As for *Harden*, which is closer to this case in terms of the nature of the cohabitation, the opinion disregards the fact that officers could have readily secured a search warrant to legitimize as evidence the fruits of a search to prove marijuana use and possession by the non-probationer occupant in the probationer's absence. They were, after all, present to execute an arrest warrant and understood that the probationer was not home. Perhaps they might have cleared the premises and opened the closet to see if the probationer was hidden there, but they had no cause to search any and all containers found therein that could not hide the probationer.

With regard to their security within their own homes, non-probationers should be protected by the Fourth Amendment's warrant requirement fully, without what is otherwise effectively absolute dilution of their privacy rights due to the residency of a probationer, at least insofar as a house-wide, exploratory search for evidence of a crime is concerned, even

though their personal interest must give way—to a degree—to permit a probation officer to have reasonable access to and supervision over a probationer.  In cases like these, the totality of the circumstances should be consulted to ensure that the parameters of a probation search were reasonable as to the probationer.  *Wood*, 89 F.3d at 928.  But the fact that they may be found reasonable as to the probationer should not end the inquiry as to the non-probationer.  *Cf. Steagald*, 451 U.S. at 219.

Here, because law enforcement was involved in the search and understood that they would be conducting an exploratory search of the entire premises for evidence of criminal activity involving guns or drugs, to include cellphones that may or may not belong to T-Srey, they accepted the risk that they might be unable to prosecute T-Srey based on application of the Fourth Amendment's exclusionary rule in the context of what was, to T-Srey, a presumptively unreasonable search.  Particularly as to the seizure of items such as cellphones, I find this to be the most reasonable application of the Fourth Amendment.

There are also other reasons for treating T-Srey more favorably than the typical cohabitant of a probationer.  While the Government has presented evidence that Neves spent his days at T-Srey's home (that much appears to be uncontested and beyond dispute), T-Srey has a different status from the non-probationers in *Harden* and *Smith*.  For one, T-Srey expressed that she did not want Neves to live with her—at least fulltime.  The Government has made a strong showing that T-Srey may have changed her mind and, absent Neves's release conditions, the two may have lived together.  However, Probation expressly forbade Neves from moving into T-Srey's house for fear it would increase his chance of recidivism.  The record shows that Neves repeatedly complained of separation

26

from his children and was repeatedly told moving in with T-Srey would run counter to his rehabilitation. So, the Government informed Neves that he could not move in with T-Srey and yet in virtually the same breath now informs T-Srey that she has diminished, if not zero, privacy expectations in her home because Neves had effectively moved in with her. I cannot reconcile these two positions. From T-Srey's and Neves's perspective, the Government did not allow them to live together. This forced separation, I think, bolsters T-Srey's reasonable privacy expectations.[10]

There is also the issue of whether T-Srey's privacy expectations are nevertheless evaporated because she knew Neves was on supervised release and allowed him in her home. Unlike *Harden*, the Government has not offered any evidence that T-Srey ever interacted with Officer Phillips in the context of a probation visit. *Id.* at 838. And if she ever had, it is doubtful it would have resembled the full-scale invasion that occurred. In fact, the only contact between Officer Phillips and T-Srey in the record is when T-Srey told Officer Phillips that Neves could not live with her. The Government argues that because T-Srey "bore witness to the Court imposing various conditions of release," Gov't Response at 24, T-Srey should have been aware of her own fading freedom. This is a curious construction. Family and friends of probationers do not relinquish their Fourth Amendment rights simply by attending court proceedings that do not apply to them. I am

---

[10] Police reports detail that when Neves was arrested, T-Srey complained that the Government always took him away. While the ultimate blame for Neves's prior incarceration and release conditions rests with him, I do not find it unreasonable that T-Srey, or anyone, would view this either as a barrier to cohabitation or co-residency. If the Government is purposefully dictating where a probationer may sleep, then it doesn't follow that those who associate with the probationer should expect their homes to be invaded. Even absent probation conditions, there is a socially recognized distinction between two people living together and two people spending significant time at each other's homes. In fact, many would recognize that co-parenting alone demands shared time and space, even when parents do not live together.

reluctant to extend the assumption-of-risk line of thinking to persons who open their doors to probationers but do not allow them to take up full-time residence.  Furthermore, assuming T-Srey had meticulously studied Special Condition No. 3, there was nothing in it that suggests that T-Srey's own residence would be subject to unrestricted searches based on Neves's regular daytime presence there.

As to the Government's interests, "[i]n some cases—especially those involving drugs . . . —the probation agency must be able to act based upon a lesser degree of certainty than the Fourth Amendment would otherwise require in order to intervene before a probationer does damage to himself or society." *Griffin v. Wisconsin*, 483 U.S. 868, (1987).  True enough, the Government believed Neves had drugs and guns and had a serious interest in finding them before either could harm the community.  However, the Government's need here was not so urgent that T-Srey's privacy interests should be forgotten.  Unlike the probationer in *Smith*, for example, Neves was not "at large."  Quite the opposite.  The Government knew his location.  The Government reasonably knew where any suspected drugs or guns might be found—either at T-Srey's home, at Neves's sober living residence, or on Neves himself.  The act-fast rationale of *Smith* is inapplicable here.  *Smith* 876 F.3d at 994.

Also troubling is that the Government seemed to have a non-probationary interest in investigating T-Srey.  Officers Duquette and Phillips both testified that even before Neves started probation, law enforcement believed gang activity was occurring in or near T-Srey's home.  And some non-probation law enforcement officers had even begun

28

surveilling the apartment. This investigatory interest is less focused on Neves's rehabilitation and did not directly support Probation's interests.

On balance, even if I were to adopt an approach built on significantly diminishing a non-probationer's expectations of privacy in the home, simply because of the regular presence of a probationer inside the home, I am not persuaded that this is a good case for dispensing with a search warrant to the extent that the Government had an interest in investigating T-Srey. The Government's interest in supervising a probationer was fully served, after all, by a search of T-Srey's premises directed exclusively toward the probationer, Neves. Because that interest was fully served as to Neves, I do not find it sufficiently weighty to overcome T-Srey's privacy interest in her own home, even if that interest was diluted by Neves's regular presence. Unless the Government was willing to forego the opportunity to use evidence against T-Srey obtained in a general search of T-Srey's own home, it should have secured a search warrant before entering her home for that purpose. I therefore GRANT T-Srey's Motion to Suppress.[11]

---

[11] T-Srey also argues that if Neves's search condition applied to her it is a violation of her due process rights. Because I find that the Government violated her Fourth Amendment rights, I do not address T-Srey's Fifth Amendment argument.

## CONCLUSION

For the foregoing reasons, Defendant Neves's Motion to Suppress (ECF No. 43) and Oral Motion for Reconsideration of Motion for *Franks* Hearing (ECF No. 72) are DENIED, and Defendant T-Srey's Motion to Suppress (ECF No. 44) is GRANTED.[12]

SO ORDERED.

Dated this 3rd day of April, 2025.

/s/ Lance E. Walker
Chief U.S. District Judge

---

[12] T-Srey filed a Motion to Sever (ECF No. 45) in the event that this exact split ruling occurred on the suppression motions. The Government shall file its response in opposition to T-Srey's Motion to Sever within 14 days of this Order.